Good morning again, next case is Bracco Diagnostics v. Jubilant DraxImage, 20-1696, Ms. Bookbinder. Thank you, and may it please the court, this is Julie Bookbinder for the appellant Bracco Diagnostics Inc. As the court is aware, this appeal applies different standards to different evidentiary records in the case that was just argued. I'm going to start out with the Riley reference that was not part of the ITC case. For all challenged claims in the 1448 IPR, the petition relied on Riley only for motivation to combine its teachings with the Klein and Tate references to disclose the claim limitation of a dose calibrator on a mobile cart. But the board found that Riley does not teach placing a dose calibrator on a movable cart. When the board then relied on Riley for another reason, not in the petition, and that we did not have an opportunity to address, concluding that the petitioner carried his burden to share that the claim limitation of a dose calibrator on board a mobile cart was obvious in view of Klein, Riley, and Tate, the board legally erred. Once the board concluded that Riley did not teach the only aspect that the petition relied on it for, Riley should not have been used. In fact, there is no reference in the record that teaches a sensitive dose calibrator used to take measurements across a wide range of radioactivity on board a mobile cart with a rubidium generator. The record evidence... Counsel, can I ask, are there any substantively meaningful differences between the specifications of the patents at issue in this appeal and those at issue in the ITC appeal? No, Your Honor, not in the specifications, but the claims are definitely different. Okay. So, the record in the IPR includes evidence that actually discourages jostling the dose calibrator in any way. Given the objective evidence in our record, it was error to credit the conclusory testimony of an expert that it would have been obvious to add this type of sensitive device to a mobile cart where it could be subject to mechanical shock and vibration, as well as high and variable background radiation from the rubidium generator. Jubilant, as the petitioner, did not carry its burden on this point. Even if Riley was considered, there is no motivation to combine Riley with Klein, which uses its dose calibrator for a different purpose. Klein's dose calibrator must make extremely sensitive measurements, including measuring a very high rubidium level and then a tiny amount of radioactivity from strontium. The radiation level from strontium that Klein's dose calibrator measures is about 30,000 times smaller than the radioactivity in the rubidium. Thus, the rubidium generator system in Klein needs to use the full range of sensitivity of the dose calibrator, making it especially important not to subject the calibrator to mechanical shocks. This is not the case in Riley, because Riley's dose calibrator is only used to measure the system will measurement for further calculations, as in Klein. Tait also uses a dose calibrator for the same purpose as Riley, to measure the dose. This is undisputed, as neither Riley nor Tait include a rubidium generator, requiring breakthrough measurements to be sure that it is safe to use the system. The board's finding of motivation to combine Tait and Riley with Klein, based on beneficial design choices that increase user convenience, is legally insufficient and not supported by substantial evidence. In fact, a conclusory assertion of design choice was specifically found to be insufficient motivation for an obvious misdetermination in the FanDuel decision that was affirmed by this court last year. Further, the board's sua sponte observation that a person of ordinary skill could just use a bigger cart is contradicted by the evidence from both sides and is not supported by substantial evidence. The board's failure to analyze the teachings in the record of Riley, Klein, and the Council, didn't Rocco agree that it could just use a bigger cart? Yes, Your Honor, at the oral hearing, we agreed that hypothetically a bigger cart could be used, but that was never anything suggested in the petition and is also contrary to the experts' Council, you didn't make an APA challenge in this case. Nowhere in your brief. So stop talking about what was raised in the petition and not, because you didn't challenge it. Either way, you're making this up an oral argument for the first time. When a party actually agrees to something in the oral argument, I find it difficult to conclude the board then erred in holding that. Understood, Your Honor. We argued in our briefing that the board improperly relied on Riley after finding that Riley did not contain the movable cart teaching that the petitioner relied on it for. But I'll move ahead to another point, which is that the board legally erred in its obviousness analysis in the 1448 IPR by considering Riley or Tate because the board incorrectly compared the prior art references to each other rather than to the patents at issue when performing an analogous art analysis. This was addressed in the 1448 written decision at APX 33 to 38. But the decision did not include a complete or proper analysis of comparing the references to the patent at issue. If the board had applied the law properly, the analysis would have shown that Tate and Riley are not analogous to the patents at issue. Now we do understand that it is a high hurdle to reverse on the basis of non-analogous art, but this is truly the case. During both tests for the analogous art analysis, the field of endeavor or pertinent to the particular problem of the challenge patents, neither was analyzed correctly by the board. First... But they all relate to computerized PET infusion systems. They're not in different fields. So, Your Honor, we respectfully argue that they are in different fields because the field is more specific than PET radioactive infusion. The field of these patents is specifically rubidium generator systems, and neither Tate nor Riley have anything to do with rubidium generator systems. And you couldn't use those systems with a rubidium generator. Doesn't Tate mention rubidium? He mentions rubidium in one sentence in the background, which was acknowledged by petitioner's Tate could not be used with a rubidium system, a generator system. Similarly, with respect to the pertinent to a particular problem of the challenge patents, it was legal error for the board not to properly identify and compare the problems to which the challenge patent and the prior art relate. In addition to these errors in the board's obviousness analysis in the 1448 IPR... Does the patent itself actually say that this invention is directed to systems that generate and infuse radiopharmaceuticals? I'm looking in particular at column one, line 25. So the patent itself defines what it's directed to much more broadly than just rubidium generators, doesn't it? So respectfully, Your Honor, we need to include generate, and that is a key component that the board omitted in its analogous art analysis. Neither Tate nor Riley generate any radiopharmaceuticals on their system. They are only infusion systems where they take a radiopharmaceutical generated elsewhere, measure it out very carefully, and infuse it into a patient. The patents relate to a completely different sort of system where the radiopharmaceutical has to be generated on the actual system and it's being infused to the patient while they're undergoing the PET scan because the half-life of rubidium is so short that you have to do it at the same time. You have to generate, infuse, scan all together. But when you're describing the technical field of your patents at column one, lines 25 to 27, you don't mention rubidium or rubidium generator infusion systems, correct? We do mention generating, just finding that column, but the field, both the field of endeavor and the pertinent problem of these patents relate to generating the radiopharmaceutical, which neither Tate nor Riley do. So, turning to the anticipation issue that runs across all three of the IPRs, this relates to, and we can focus on claim 21 in the 468 patent, the last two limitations, a computer configured to determine at least an activity of strontium-82 and an activity of strontium-85 in the eluate from the breakthrough activity data, and the computer further configured to prevent the patient infusion procedure if the activity of the strontium-82 or the activity of strontium-85 exceeds an allowable limit. Because it is undisputed that the petitions relied on anticipation by Klein for these limitations, the board should have decided whether Klein expressly discloses a computer that performs the claimed steps. Instead, the board erred in at least two ways. First, the conclusions are not supported by substantial evidence because Klein does not disclose these limitations. And second, the board erred by not relying on express disclosures. Counsel, Dr. Stone testified that a skilled artisan would understand Klein to be disclosing a computer preventing infusion once breakthrough is detected. In his declaration at 14.451, he says that expressly. However, neither Dr. Stone nor the board explained why a person of ordinary skill would understand that. There was just his conclusory statement with no explanation. And that's inadequate to support a finding of anticipation. Finally. I don't think that's right. Look at 14.160 to 161. Klein's daily flush and calibration enables the system only once the prerequisites, which include confirming no strontium breakthrough are completed. I mean, you may be right that the reference doesn't indicate that it is expressly going to prevent. But, I mean, the record is pretty darn, the reference is pretty darn close. And I'm not sure how I can find Dr. Stone's testimony that one would understand it to prevent in light of the way it's disclosed is not supported by substantial evidence. I mean, you've got a really high hurdle here. And you've got expert testimony that doesn't feel particularly conclusive to me in light of what's actually disclosed in the reference. I appreciate, Your Honor. But it's important to remember that the claim requires that a computer prevent the patient infusion procedure if the strontium level exceeds the allowable limit. And Klein simply does not disclose a computer doing that. I'll reserve my time for rebuttal. Thank you. Thank you, Ms. Bookbinder. Mr. Hales has 15 minutes. Thank you, Your Honor. Okay. So, we are now in the IPRs. But we have many of the same issues that we discussed in the prior session at the ITC, right? We have disputes over whether it's obvious to relocate the dose calibrator onto a movable cart. We have a dispute over whether Klein discloses a computer that performs this prevent operation. And this is the third set of eyes that has taken a look at this and come to the same conclusion based upon what is not identical, but strongly overlapping sets of materials. With respect to the computer, we think these statements are crystal clear. They are well understood. This argument that we see from BRCAO is more about, in our view, an in hake verba test, whether they use the exact same language as described in the claim. But when you have a statement, for example, on 14186, that says the system software ensures that this daily protocol is followed and enables runs only after its prerequisites are met, that's something that a person of skill, you know, with or without expert testimony, understands that we're not allowing these runs to perform. They are not enabled if the prerequisites are not met. So, they are using just different language to say the exact same thing. Okay, counsel, I agree with you on that. Why don't you move on instead and tell us why the references are, in fact, analogous arts, focusing in particular on her claim that this is to generation. I mean, every single claim in their patent says a generating system. So, generation seems to be an important element of this invention. And her argument seems to be that the prior art references don't fall into that analogous art. So, why don't you go there? I'm happy to. Okay, so, again, please review Bracco's brief and see how they explain that this happens. This rubidium generation system, it's 30 years old by the time that we get to the filing of these patents. The generation of the rubidium, that's 30 years old, right? The problem that Bracco identifies, both in its patents and in its briefing, is that it's, you know, that they're elaborate and they're hard to set up and the maintenance and operation is complicated. Klein definitely speaks to that in the context of a rubidium system, but so does Tait and so does Riley. And it talks about, they answer those kinds of issues in, you know, in the domain of PET imaging general. But don't Tait and Riley's dose calibrators do something totally different than Klein's dose calibrators? That is correct. It is used in a different way. It's used in a way that's appropriate for that FDG medicine. That's correct. It's not the usage, though. We're not proposing anywhere in our obviousness challenge to use the dose calibrator in any way that is different than Klein. I mean, Klein does the dose calibration. Klein looks for the strontium, excess strontium levels. You know, Klein's dose calibrator does all of the things that are required to be performed in the claim. It just does it sitting on a shelf. And our point is that... So are you saying you don't even need to combine Klein with Tait and Riley? Because that's, to me, the weakest point in the board's analysis. I don't see how... Can I finish? Yes. I don't see how a skilled artisan would be motivated to combine Tait and Riley's dose calibrator so as to duplicate the activity counter already on Klein's cart. And we're not suggesting to duplicate the activity counter. We're suggesting to keep those as-is. All we're talking about is picking this device up and putting it on a cart in a way that simplifies life. It's a user convenience thing, as Dr. Stone testified. In our view, I mean, in particular Tait, Tait's an example of a device that's far more market-ready than this design that was in a university environment. And it's an example of the kinds of things that people would do. And it's an example... I think, again, Dr. Stone testified that just placing something, you know, two pieces into a unitary system to make it easier as a product out in the marketplace, I think is substantial evidence right there and provides the motivation. And Klein... Sorry. And Tait shows that it can get done, right? It can get done. You can put a dose calibrator on a movable cart because Tait did. Again, we're not talking about using it in the way that Tait says. We're talking about using it in the way that Klein says. And so that's the evidence that they relied on, the board. Let me get to the right part. I'm at the top of... Actually, the bottom of Appendix 40 and going over to 41. It's a beneficial design choice that increases user convenience. They cite to Stone. And, again, Riley, Tait, and Klein all show that these components are really well-known. The dose calibrator is a well-known commodity device at this time. The Capintex CRC-15 is something that's available. It's the gold standard product that's available to people of skill. And this is just reusing well-known things in their familiar ways, as Klein discloses, simply just in a different arrangement. With respect to the analogous argument directly, Bracco complains that the board did not consider the 468 Patent's disclosures, but they absolutely did. That's at Appendix 37. They discuss Klein, Riley, and Tait together and then identify a need in the art identified by the 468 Patent and then explains how Klein, Riley, and Tait align with those needs. So, again, and they make factual findings that they are analogous at that level, and they decided that that was sufficient. The other thing that I would like to point out is this idea of the determining. Ms. Finder talked about, oh, there's no disclosure of a computer that performs this determining step. That was a step that was not argued in Bracco briefings. That's a step that came up in oral arguments and was identified impliedly as new. So if you go through, for example, the briefing, they argue about, at Appendix, for example, 1051 through 1052, they argue this idea of the computer doesn't prevent elutions. If you look at Appendix 1429, Counsel for Bracco gets up in oral argument and says, hey, everyone agrees that the claim says computer event, but it actually does more than that. And he talks about four steps, and he goes into an elaborate discussion of four steps and how the prior art allegedly does not teach two of them. It does not teach the prevent step, but also doesn't teach the second determining step, which I think precedes it in the claim. I mean, that's a pretty good tip-off that these are new arguments, that this determining step should have been argued separately in briefing, and it absolutely wasn't, and the board was correct to find those arguments waived. I think I've covered most of the things that I want to cover. I want to make sure, are there questions from the panel? The other thing that I would point out is... Hey, Counsel, this is Judge Moore. I'm just going to give you a little friendly piece of advice. When you raise arguments during your time that weren't raised by the other side, you now open the door to them addressing them on rebuttal, whereas if you hadn't addressed them, they wouldn't be able to. Like the last argument you just made where the board didn't just find for you on waiver, it found for you on the merits, too. You know, just something to think about for the future. Bye. Thank you. OK. The last thing I would say is that throughout these proceedings, the board looked at our experts' declaration and found that it was eminently credible, found it corroborated materials, and was corroborated by the materials that were of record. The same cannot be said for Bracco's expert. Dr Pelk was identified in not only this proceeding but elsewhere as offering conclusory opinions, and his testimony was not accepted by the board. OK. That's what I have. Thank you very much. Thank you, Mr Hales. Ms Bookbinder has four minutes for rebuttal. Thank you, Your Honour. To touch on the point raised by Counsel about whether we waived a limitation, as an initial matter, of course, it's Petitioner's burden to show how the prior art discloses the limitation, and it would be inappropriate to shift that burden to the patent owner to first show that the prior art does not disclose that, but notwithstanding that principle, we did, in our patent owner response, address that the system has no knowledge of what the breakthrough determination is, and we went through this. And this is APX 872 to 875 are an example of places where that came up. Then, also to address the preventing a patient infusion if the strontium level exceeds the allowable limit, I would like to turn to APX 14-201, which is Figure 3-15 of Klein. And this is the detailed flow chart of what the computer does for the daily protocol. The only portion of this that refers to anything having to do with breakthrough is the calibration run. And, in fact, Petitioner-Jubilant pointed to a smaller block diagram with just a box for calibration. So that is the portion of the daily protocol that they're relying on to disclose the claim limitation of a computer configured to prevent the patient infusion if the strontium exceeds an allowable limit. And there is nothing in this flow chart of the computer steps for determining the breakthrough or preventing the infusion if the strontium breakthrough value exceeds the allowable limit. It's simply not disclosed. My second point, or third, I believe Council just argued that if you move the dose calibrator onto Klein's cart, you're not using the dose calibrator, as Tate says, which is precisely the reason that you can't move the dose calibrator onto the mobile cart in Klein. The dose calibrator has to be used to take a wide range of very sensitive radioactivity measurements that you do not have to take in Klein and that would not work properly in Klein. You don't have to take those measurements in Tate. And it would not work properly on Klein's cart because of the mechanical vibration and because of the high and variable background radiation caused by the generator, which is only in Klein and not in Tate and Riley. If the panel has no other questions, then I will cede my remaining minute. Thank you, Council. You've both infused us with a lot of food for thought and we'll take the case under submission. Thank you.